at all, for a large amount of at least 15 minutes to be shared by the Senate, Mr. Devlin v. Richard Kalm, and Ms. Sherman, please come to the podium. Good morning, your honors. May it please the court, Michigan Assistant Attorney General Anne Sherman here on behalf of Defendant's Appellants Kalm, Cleland, Bush, Beechnaw, Davis, and Alagna. I'll be speaking, or arguing, for 13 minutes. I would reserve one minute of that time for rebuttal. And counsel for Defendant Appellant Janet McClellan will be arguing for three minutes, and he'll reserve one minute of that time for rebuttal. You guys really don't want discovery in this case. I mean, this is setting a record for interlocutory appeals pre-discovery. Yes, your honor. It just, it was the path the case took. And obviously the reason we don't want discovery, we have, we're up here on qualified immunity, and one of the real benefits of qualified immunity is not just immunity from liability, but it's immunity from all the burdens of suit, including discovery. The crux of the case before the court today is whether these defendants, or defendants, officials in these defendants' positions would have known, based on some sort of clearly established law, that when they terminated Patrick Devlin, they were violating First Amendment or due process rights. Based on the most closely analogous case law, they should be afforded qualified immunity, both on the First Amendment and the due process claims. I mean, in Pickering balancing, so Pickering's clearly established. There's no debate about Pickering being clearly established law, right? So then you get into this balancing test, which I've always thought makes qualified immunity and a motion to dismiss impossible, because the balancing turns on exactly what was going on. And so I don't know what to say, but it strikes me as incredibly difficult to win that kind of a thing without at least some discovery. Because you get to take their complaint, and you give it all the inferences, and I don't think this is implausible. I don't think you win on it-ball grounds. So I may share your skepticism about the ultimate merits of the case, but I'm really struggling with how we do this, and a motion to dismiss. Well, there are certainly many cases where there hasn't been any discovery or limited discovery. But the reason in this case why it doesn't matter is because the issues that are before this court now, we are not saying that we don't agree with. We're accepting for purposes of this appeal that both sides agree that Patrick Devlin called the Attorney General a deadbeat. And Patrick Devlin has admitted in his amended complaint that he's admitted through documents that we've attached here that were referred to in the amended complaint, that he did release certain confidential information. And on that basis alone- I want to talk about both of those points. Yes. But I'll just ask one, and then I'm going to let Judge Gibbons ask her question. You would concede, wouldn't you, that the deadbeat comment is speech about a matter of public concern? I haven't conceded that in this case, but I don't think it's my strongest argument. I have made the argument that it's- So you're telling us it's not public concern when the Attorney General of a state, for whatever reason, declines to enforce statutes that he's charged to enforce? I have made the argument that the manner in which it was done and the unnecessary disclosure of confidential information- I'm not talking about confidential- I'm just- I want to step back and more generically say, isn't it true that if somebody says a senior state law enforcement official is not enforcing the law? I mean, that's- Absolutely. And that's what he said. He said it in a colorful way, but that's what he said. So just to clear out sort of the underbrush that we don't need to write about in an opinion, that's- Well, I would say that is not my strongest argument. I did make the argument that that was an employee beef, but- Let's assume that the public concern issue is not going to go your way. Yes. The issue of confidentiality really goes to balancing, doesn't it? It does, and this- I mean, it goes to disruption. Yes, Your Honor. And I think the point that Judge Sutton is making is that unlike qualified immunity in many other contexts, in this sort of First Amendment retaliation case, if you have to get to the balancing part of the test, you just don't have an adequate record to do it in the absence of discovery. I mean, what would be our record in this case with respect to balancing? What I would say here is that the law is not that every time a case goes to Pickering balancing, you have to have discovery. I didn't say it was. I just said it's very difficult to- It's just a different kind of animal and a different kind of analysis- Yes. I agree, Your Honor. ...than you're typically dealing with in a qualified immunity context. Yes. But the documents that we have attached that were actually referred to in the amended complaint are sufficient here for this Court to determine that the comment about the Attorney General being a deadbeat in enforcement- I have to say I'm struggling a little with that. Maybe I'm just echoing what Judge Kethledge was saying. The complaint is about what the Attorney General is doing with these statutes. Deadbeat is a way to get people's attention. It may not be tasteful. It may not be tactful. It may ultimately hurt in a big way in winning before a jury. But the notion that that phrase- We have a lot of cases, a lot of cases, saying you have a First Amendment right to swear at officers. Yes. Okay? Deadbeat's not a swear. It's insulting. But Pickering does- And you'll probably pay a price for it. But the notion that this somehow makes it not free speech is astonishing. But Pickering makes a distinction. For example, it talks about the Cohen case, the jacket with a distasteful word on it. F the draft. And it says, you know, you have a First Amendment right to say that. But that doesn't mean an employer doesn't also have the right to restrict that kind of speech when it's paying somebody's salary to contribute to the efficient running of the operation. And that's true here. And I think if you consider the law enforcement context of the Michigan Gaming Control Board and the close relationships with the Attorney General and his office and the Michigan State Police in a law enforcement context- But how are we going to consider that? How are we to consider- What document tells us that there is such a close relationship? What document addresses the context? Well, I think this court- There isn't a document that defines that. But it is very clear that the Michigan Gaming Control Board, by statute, does enforce gaming laws. There's a law enforcement context even apart from the Attorney General. And case law has recognized that that law enforcement context is very crucial. It changes the equation. And so does the need for confidentiality. Well, I mean, I don't know. I'm not sure I understand. I mean, I'm not sure this record would permit me to understand the law enforcement context. I mean, what I understand is that Mr. Devlin occupied- I can't remember what the position was called. But he was, you know, kind of the person who was responsible for the monitoring of certain activities. And he ultimately complained about the fact that the Attorney General was not enforcing certain laws with respect to the tribal casinos. And that's about all we know about it. I mean, what do we know about the way the gaming board operated, about how this affected the board internally, about the relationship among the various folks? What do we know about that? Well, we do know that deadbeat is an inflammatory caustic word and that calling somebody with whom the agency works very closely is going to deteriorate relationships. But you can't balance deadbeat against nothing. There has to be something evidentiary, doesn't there, in this particular case to balance deadbeat against. Well, the other thing we have are the standards of conduct on becoming to a state-classified civil servant. They're held to a higher standard. How about the First Amendment, on the other hand? I mean, we're kind of saying the same thing over and over. On the one hand, it seems you have just a manifest First Amendment interest on the one side of the Pickering scale for the reasons we've talked about. On the other hand, we have, at least at this stage of the case, what almost, to me, reads as governmental puffery. You know, the name-calling of the Attorney General undermined the trust and confidence that are central to Devlin's position. The potential disruptiveness of Devlin's speech to interfere with the Gaming Control Board mission was enough to outweigh whatever First Amendment value his speech had. I mean, maybe after evidence, but can't you see the difficulty we have? I mean, this, to say that, okay, this outweighs what's in interest? But this Court has also said that great deference, even where something is a matter of public concern, great deference should be given to the governmental employer's judgment that this would be disruptive. We don't even have that judgment. We have speculation about potential disruptive. I mean, with all due respect, and, I mean, you've done a fine job in the briefing here, but what we have here is lawyer testimony, not real testimony. Don't we have to get to real testimony to do this balancing? And I would submit to you that that would negate the very purpose of qualified immunity and being able to come before the Court and do a Pickering balance without always having discovery. Now what this Court is saying... Talk to the Supreme Court about that. They created the Pickering test. It's a logical consequence of that test that most times it will require discovery. So that's not our problem. They did, Your Honor, but they... You have to agree it is a logical consequence of balancing a bunch of facts that it will normally require discovery. So I don't know what you think you're getting with this argument. I would also say, Your Honor, that over and over, the Supreme Court and this Court has said that qualified immunity is freedom from the burden of... I have to acknowledge, I'm speaking only for myself, and I'm getting slightly grouchy on this point, but I just want to mention one thing. You know, there was a Supreme Court case in about 1996. I don't know the name of it, but Scalia wrote the opinion, and the question was whether you could both bring an interlocutory appeal for a motion to dismiss from losing a motion and denial of summary judgment. At least two justices, maybe more, said no, you've got to pick one. We are not going to have lots and lots of interlocutory appeals. Had that court heard that the Michigan AG's office was filing three interlocutory appeals at the motion-dismiss stage, I think they would have been outraged. And this may have been Judge O'Meara's fault, so maybe I'm talking to the wrong person, but did you raise all of these arguments in the first motion? And he just did it seriatim. He said, today I'm going to get rid of the case on this ground. I have to say I did not handle this case when the first motion was raised, and only Younger extension was raised. This court on appeal said that was a very novel application of Younger. The second time I raised everything, and Judge Yonker chose... Why shouldn't you do it? Judge Yonker, I thought it was Judge O'Meara. I'm sorry, Judge O'Meara. I raised all of these issues in the second motion. But you didn't do it in the first? I don't understand why the rule shouldn't be. If you didn't raise this in the first one, the way this works is you don't get to raise one, lose, and then keep getting interlocutory appeals. I mean, this is judge-made law on the interlocutory appeal front. And I don't know, I'm speaking only for myself, a little bit grouchy about it, but I would not keep doing this. And if you don't raise them in the first motion, I think the panel is going to say, forget it. We are not going to prevent these people from getting to litigate their cases ever, because you keep filing interlocutory appeals. They were not raised by office in the first motion. I think the attorney relied on younger abstention, but they certainly were raised in the second one. And Judge O'Meara decided it only on Burford abstention grounds and not on these other grounds. And on the remand, we did bring up these issues, and they were dismissed without prejudice. If you lose this, are you going to have another motion to dismiss interlocutory appeal? I think it will be remanded. We will probably enter into discovery. I said if you lose, will there be another motion to dismiss interlocutory appeal by you? I . . . If there . . . well, now Judge O'Meara will allow discovery. I would have thought that was easy. Well, this Court has indicated that there needs to be discovery. I think it will allow it. To take a slightly different tact and not ask you anything, it just might be that perhaps, given the tenor of the questions in this case on the First Amendment claim, it just might be that the panel might issue an opinion that would strongly indicate that the better course of discretion for the Attorney General was to get on with the development of the record on the balancing test. Yes, Your Honor. Okay. I think we will hear from Mr. Hawkins at that point. If he's still interested. Thank you, Your Honor. Thank you and good morning, Your Honors. Michigan Assistant Attorney General Jason Hawkins appearing only on behalf of Defendant McClellan. I argue separately just to highlight a few of the key facts applicable to her because this Court must analyze her specific conduct. And I would just submit that the plaintiff has failed here to put forward any specific non-conclusory allegations against her that would depict any objectively unreasonable conduct that a reasonable person would believe to violate his constitutional rights. Doesn't he lay out her position at the time of the actions he's complaining about, and it's basically a sin of omission that, you know, read generously the complaint is making as to your client? Right. His allegation is that she was copied via e-mail with this letter and that she didn't do anything to intervene on his behalf. But she was not his supervisor. She didn't participate in an investigation. She didn't make the decision to discharge him. Even if you're taking the allegations as true, they're just simply legally not. Well, I mean, as I understand his allegation, it's she had the authority to stop this and she didn't. That is the allegation. Right, and that's usually what we go on at this stage of the case. Now, what you said in response, if fleshed out with testimony, sounds like summary judgment material potentially, but it doesn't sound like 12v6 material. I would say that they're just mere legal conclusions and speculation. Not as I characterized it. Well, if he's saying that she had the authority to intervene, that's just simply not supported by the law, the civil service rules and regulations. It offers superintendent control over a grievance, which at this time there was none because there had been no discipline rendered. How do we have jurisdiction over your client's appeal? I'm sorry? How do we have jurisdiction over your appeal? It's not qualified immunity. We have sought qualified immunity as to the claims against her in her personal capacity. But you're not arguing qualified immunity right now. You're arguing just a straight-up motion to dismiss, as I understand it. I am arguing qualified immunity because if you look at her conduct in this case, I don't think it rises to the level, he hasn't met his burden to strip her of her entitlement to qualified immunity in this case because I don't think a reasonable government official in her position. For purposes of the appellate argument, it's characterizing what is really an argument that insufficient personal involvement is alleged and packaging it as the lack of an allegation of a constitutional violation is to her so that we can consider it in the qualified immunity context. Right. I'm just, I guess, perhaps not articulating it clearly, but I'm just asking the court to look at her conduct in here and whether that rises to the level that would be objectively unreasonable. Okay. That's helpful. Thank you. Thanks. Thank you. Mr. Devlin. Please, the court, Patrick Devlin, representing myself. And I've listened to your questions, so I think I'll make this more terse. The genesis of this case has to do with the tribes in Michigan selling liquor to customers without liquor licenses. And each, under Michigan law under the penal code, each sale, each possession is a felony. So we're talking hundreds of thousands of felonies and none of them have been prosecuted. And as you said, you don't have any background, but I brought this to the attention of the executive branch. There were different personnel then, but the liquor or the gaming control board told me to go to the Liquor Control Commission that they didn't have any jurisdiction over it. So I went to Liquor Control and Liquor Control told me, well, all they can do is suspend licenses and fines, but they have no authority over criminal prosecution, go to the AG. So I did, and that process took over two years. And they said they were studying it, and nothing became of it. In the meantime, because you can make a whistleblower complaint not only to the executive branch, you can make it to the legislative and judicial. I went to the auditor general's office, who works for the legislature and is supposed to be auditing over noncompliant functions by various state agencies, and they didn't do anything. They, in fact, called my agency and told them that I had complained to them. One thing that was done was on the due process claim, it does seem like there's a letter, there's notice, there was a kind of a hearing, there's an option of a post-termination hearing. I realize motion to dismiss, you get all the benefits and inferences and so forth, but why even under the terms of your complaint? Didn't they comply with case law? Well, I disagree. The problem is that their charges, if you look at them, are very conclusory, like you violated Rule 4, you were insubordinate. But it doesn't say what I did or when I was alleged to have done it. The whole point of Loudermill is, in order to give a right of reply hearing, you have to know at least some delineation of what the charges are about, other than just like Mopri on the high C or something. You got to know, and then you have to give discovery. They gave me no discovery. I wrote that letter, amongst other things, to get discovery. Loudermill requires discovery in all cases? Yeah, it does. The material that they're relying on to support the charges, Loudermill requires that. That's probably the fundamental part of Loudermill, and I didn't get it. All I got from them was a copy of the newspaper article. You got a notice of an investigatory conference. Correct. And that set out what the nature of the questioning would be. It listed the department policies. You received written notice of the disciplinary conference. You replied with a notice defending your actions. The investigatory conference, they suspended me. Then they gave me an investigatory conference. They don't ask me about what they're not. As you pointed out, we now have lawyer pleading here. They didn't ask me about any alleged privacy or what documents. That didn't even come up. I wrote the letter because I could see where the freight train was going. They were not going to give me the charges, despite the specific charges, and they were not going to give me the discovery. So I wrote that letter asking for it, and I said, if you're not going to give it, at least based on what you've given me, I'm going to tell you what my position is. So I get into the so-called Loudermill conference,  you're fired. Now, that you're fired, do you want to say anything? And I said, yeah. Again, give me the grounds. Well, I'm not going to say anything other than you called the attorney general a deadbeat. So that's noncompliant with Loudermill. Yeah. Well, only if you think there's a better reason or more, a reason they didn't tell you about. In a way, that's actually ultimately supportive of causation on your retaliation claim. It may have destroyed your due process claim, but it really helped your First Amendment claim. You want them to have only relied on the deadbeat comment for purposes of your First Amendment claim. You shouldn't be asking for more reasons. You should be thrilled that there's one reason. Because I didn't do anything wrong in my view. So I was happy to reply. You're asking them to manufacture stuff that in order to provide you process, you're asking that they be required to create documents and other bases that were apparently not the reason you were terminated according to that. You raise a good point. They file this motion. A very good answer to it is to say I withdraw my due process claim. No, I still feel offended because what do they do here? They attach to their motion documents that they claim were in existence at the time of my firing, which they didn't give me, which they didn't mention and wouldn't give me. Now they're trying to bootstrap. Do they create a theory other than a free speech causation related theory of retaliation? Do those documents? Yeah. I don't think so. They just mentioned things like random things like insubordination and this and that, but they don't say what was insubordinate. Apparently, if you follow the law, that's insubordinate. Apparently, if I make a whistleblower complaint, that's insubordinate because under their view, in order to make a whistleblower complaint, you got to go to the person violating the law and tell them that they're violating the law before you can make a whistleblower complaint because that would be insubordinate to go outside your chain of command. I think you're just echoing Judge Gibbons' point. This is really helpful to you. This really helps your retaliation slash whistleblower First Amendment claim. Yeah. I don't know that I'd be looking for too much more elaboration under latter mill. All right. Anything else we can do? I'm just kidding. Obviously, I had enough to go 15 minutes, so I'll just hit a couple little points. Nothing's required. It's okay not to use all your time. But it's also okay to use it. Thank you. Well, with that, I will conclude my remarks. Thank you. Thank you. All right. Thank you all. We'll consider the case carefully. Appreciate your arguments. I think that concludes the arguments for this morning, and you may adjourn court.